## FIRST COUNT AGAINST SECOND AND THIRD DEFENDANTS
(Indemnity)

32.    EMG hereby realleges and incorporates herein the allegations set forth in paragraphs 1 through 31 of this Complaint.

33.    The circumstances set forth herein created an agreement of indemnification between each of the Indemnitors, jointly and severally, on the first part, and EMG on the second part, whereby each and every one of the Second and Third Defendants will indemnify EMG in the event that the First Defendant fails to pay moneys due under the Fee Agreement or otherwise.

34.    First Defendant has failed to pay the moneys due EMG under the fee Agreement, or otherwise, though demanded.

35.    EMG has demanded Second and Third Defendants pay the moneys due by First Defendant under the Fee Agreement or otherwise.

36.    Each of the Second and Third Defendants have failed to pay to EMG, the money due to EMG by First Defendant under the Fee Agreement or otherwise.

37.    The failure of the Second and Third Defendants and each of them to pay the moneys due to EMG under the Fee Agreement or otherwise in a breach of the indemnity set forth above.

## DEMAND FOR RELIEF

WHEREFORE, plaintiff demands judgment against each and every one of the defendants, jointly and severally on each of the claims set forth above, in the sum of US$176,250, being either the outstanding sum due under the Fee Agreement, (2.35 per cent) of the amount redeemed ($7,500,000.00) or being the outstanding current amount for the reasonable amount for the work,

labor and services provided or otherwise, together with interest thereon at the rate of nine per

cent per annum amounting to $18,506.25 as of April 1, 2007, or such other greater interest if

permitted by statute or law from January 31, 2006, together with the costs herein incurred and

such other and further relief as may be just, proper and equitable, besides the costs and

disbursements of this action.

Dated:  New York, New York
       April 5, 2007

LAW OFFICES
JOEL Z. ROBINSON & CO.
by:

Joel Z. Robinson (JR-9802)
Attorney for Plaintiffs

50 Broadway, Suite 2202
New York, NY, 10004-1674
(212) 791-7360

VERIFICATION

STATE OF NEW YORK,
COUNTY OF WESTCHESTER          ss.:

I,      THOMAS M. FLOHR                    being duly sworn, depose and say : I am

the plaintiff

in the within action; I have read the foregoing Complaint

and know the contents thereof; the same is true to my own knowledge, except as to those matters
therein stated to be alleged on information and belief, and as to those matters, I believe it to be
true.

THOMAS M. FLOHR

Sworn to before me
on April 7, 2007

Notary Public

CARMEN A. SMITH
Notary Public, State of New York
4970000
Qualified in Westchester County
Commission Expires

CARMEN A. SMITH
Notary Public, State of New York
No. 4970000
Qualified in Westchester County
Commission Expires 1/27/2011.

# EXHIBIT A

### Fee Agreement
### Between
### Emerging Markets Group and International Business Associates, Ltd.

The Parties hereto, hereby agree to the following terms with regards to any fees due and payable to Thomas M. Flohr, or Emerging Markets Group, or any of its affiliates (together "EMG"), by International Business Associates, Ltd. ("IBA Ltd."), related to the proposed transaction between Harken Energy Corporation and/or any of its affiliates and IBA Ltd. (these two hereinafter referred to as the "Transaction Parties") as described in the Letter of Intent dated August 10, 2004 and as more fully described in pending agreements between the Transaction Parties.

1. The total fee payable to by IBA Ltd. to EMG with regards to transactions between the Transaction Parties shall be $400,00.00, which shall become payable upon closing of the aforementioned transaction.

2. The fee shall be payable as follows:
   a) $100,000 payable by check or wire transfer, once the funds set forth in the above referenced transaction have been received by and are available to IBA Ltd., to EMG in such names and accounts as EMG may designate.
   b) $300,000 shall be amortized in conjunction with the redemption of the $12,500,000 IBA Ltd. Series A Preferred Shares as set forth below.  Commencing with the first allocation of funds for retirement of such shares, EMG shall receive an amount equivalent to 2.35% of such funds (rounded to the nearest $100) until such time as the full amount due to EMG has been paid.

   For Example:
   Beginning Balance due EMG: $300,000
   Funds available for retirement of preferred:  $2,300,000

   Payment to EMG to be calculated as follows:
   (2.35% x Funds available for retirement of preferred = Amount to be paid to EMG)

   2.35% x $2,300,000 = $54,050

   Remaining balance following above payment:    $245,950

   Payments made under this Section 2. b) shall be payable by check or wire transfer, to EMG in such names and accounts as EMG may designate.

3. IBA Ltd. hereby indemnifies EMG from liabilities to any unaffiliated third party arising from work performed by EMG in connection with the proposed transaction referenced above, other than those arising from the gross negligence of EMG or those expenses, out-of-pocket or otherwise, that have not been previously approved by IBA Ltd.  Any disputes under this agreement will be resolved by arbitration among two lawyers or accredited arbiters, one each chosen by EMG and IBA Ltd., selected within 30 days of notice of a dispute, and a third lawyer or accredited arbiter selected within 30

02/14/2006 12:09 FAX  908 766 5912          I.B.A.                                    ☒003/003
    Sep 08 04 06:56p    Thomas Flohr
                                              208 545 2495
                                                                    P.3

      Sep 06 2004 12:43PM  HP LASERJET 3330

                                                          P.3

                    EMG/IBA Ltd. Fee Agreement – Page 2

days by the initial lawyer(s) and arbiter(s). The arbitration will be resolved by majority
determination of such representatives within not more than an additional 60 days and the
cost of the arbitration will be allocated by the arbitration between EMG and IBA Ltd.
The arbitration may be conducted informally or as agreed by the arbiters. The arbitrated
decision will be final and binding on EMG.

4. The laws of the State of New York will govern this Agreement, and EMG and IBA
Ltd. consent to jurisdiction and service of process in New York, and entry of judgment in
the States of New York and New Jersey.

This letter agreement supersedes all other understandings between the parties, whether
written or oral, with regard to any fees due or payable between EMG and IBA Ltd.

**International Business Associates, Ltd.**          **Emerging Markets Group**

By _____                         By _____
    John Kean, Jr.                                      Thomas M. Flohr
    President & CEO                                     General Partner

Date: September 8, 2004                            Date: September 8, 2004

# LETTER OF INTENT

**THIS LETTER OF INTENT** ("LOI") is made and entered into as of August 10th, 2004, by and among (between) Harken Energy Corporation ("Harken"), a Delaware corporation, and International Business Associates, Ltd. ("IBA"), an exempt Turks and Caicos company.  Harken and IBA are collectively referred to herein as the "Parties" and individually as "Party."

**WHEREAS**, the Parties have recently had discussions concerning potential business relationships with respect to business opportunities involving natural gas trading and other related activities in the European and the United States natural gas markets. Each of the foregoing items being referred to herein individually as a "Project" and collectively as the "Projects"; and

**WHEREAS**, the Parties have entered into a Confidentiality and Non Compete Agreement; and

**WHEREAS,** the Parties desire to set out a preliminary outline regarding a potential transaction (the "Transaction") between the Parties and/or their respective designated subsidiaries; and

**WHEREAS**, the Parties recognize that the Transaction outlined in this Letter of Intent is contingent upon and will require the completion of due diligence between the parties, further discussion, documentation (including the drafting of definitive and formal agreements), and approval of the Transaction and formal agreements by the respective boards for the Parties; and

**WHEREAS**, IBA is in the process of raising equity to support its pursuit of Projects in the European and US natural gas markets; and

**WHEREAS**, Harken has reviewed preliminary information regarding IBA's plans and Projects, and desires to make an investment in IBA subject to the contingencies and conditions described herein.

**NOW, THEREFORE**, the Parties execute this Letter of Intent for the purpose of setting out a preliminary outline of the potential Transaction with the objective of working toward a closing of definitive agreements by August 27, 2004.  Subject to the foregoing contingencies and declarations, the Parties contemplate structuring a Transaction whereby:

1.  Harken would invest $12.5 Million in cash (the "Harken Investment" or "Investment") in IBA upon the signing of a definitive agreement with respect to its Investment in IBA containing the terms and conditions set forth in Paragraphs

2 through 6 of this LOI and such other provisions as mutually agreed between the parties.

2. In exchange for the Harken Investment, Harken would receive 0% coupon, non-voting, preferred stock in IBA plus 3 year warrants exercisable for 48% of the common equity of IBA at a nominal exercise price. The purchase agreement under which Harken will acquire the stock and the warrants would contain protective covenants (e.g., Harken's right to veto any merger or sale of IBA to a third party, until such time as the preferred has been redeemed.) as well as full ratchet anti-dilution protection for the shares for which the warrant is exercisable, pre-emptive rights, "tag along" rights and registration rights for the shares underlying the warrants. The preferred and the warrants would be transferable by Harken to a Harken affiliate, subject to compliance with all applicable federal securities and "blue sky" laws.

3. Once IBA's annual after tax income reaches $2 Million, 50% of IBA's after tax profits would be used to redeem the preferred, with payments to be made not less than annually. At the time that 100% of the preferred stock has been redeemed, IBA would be relieved of its obligation to distribute after tax profits except as directed by IBA's Board of Directors.

4. Until such time as the preferred is redeemed in full, Harken would have the right to nominate a majority of the members of the IBA board of directors. It is the intent of the Parties that IBA's board of directors will consist of five members (Alan G. Quasha, Mikel D. Faulkner and another Harken representative (the "Harken Designees"), and John Kean, Jr. and Stanley J. Brownell). Following redemption in full, Harken's representation would be consistent with its percentage of equity ownership in IBA at such time, assuming that the warrants had been exercised in full.

5. In the event that IBA requires additional working capital to continue its operations prior to redemption of the preferred stock referenced herein, Harken would have the first right, but not the obligation, to invest further on terms similar to the terms set forth herein, (i.e. put up additional preferred with warrants on the same basis, thereby increasing its stake beyond 50%).

6. IBA would agree to operate according to the management guidelines as set forth in Exhibit 1 attached hereto.

7. All notices, requests, consents, waivers and other communications required, permitted or desired to be given hereunder or by law to be served upon or given to a Party by any other Party shall be deemed duly served and given when received after being delivered by hand, courier or facsimile or sent by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

2

HEC Comments 8/06/04

If to Harken:

> Harken Energy Corporation
> 180 State Street, Suite 200
> South Lake, TX  76092

If to IBA:

> International Business Associates, Ltd.
> 40 Mountain Top Road
> Bernardsville, NJ    07924
> USA

Each Party may change its address for the purpose of this section by giving written notice of such change to the other Party in the manner provided in this section.

8.  <u>Term</u>.  This LOI shall remain in full force and effect for a period of one month from the date hereof, unless either extended or terminated by mutual agreement, in writing between the Parties.

9.  <u>Governing Law</u>.  This LOI shall be governed by and construed and enforced in accordance with the laws of the State of New York, USA without reference to the conflict of laws or principles thereof.

10. <u>Final Agreement</u>.  The Parties understand and agree that a definitive agreement will be subject to satisfactory due diligence, approval by the Parties' respective boards of directors and the signing of a mutually acceptable definitive agreement.

11. <u>Obligation or Joint Venture</u>.  The Parties agree that unless and until a definitive agreement has been executed and delivered, the conditions stated herein constitute the entire business relationship between the Parties.  Neither Party will be under any legal obligation of any kind whatsoever with respect to such relationship except for the matters specifically agreed to herein.

12. <u>Binding Effect</u>.  The Parties agree and understand that the provisions of Paragraphs 1 through 6 of this LOI are non-binding on either Party, and that the provisions contained in Paragraphs 7 through 13 of this LOI are intended to be binding and enforceable between the Parties.

13. <u>Counterparts</u>.  This LOI may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Any executed counterpart transmitted by facsimile or similar transmission by any Party shall be deemed an original and shall be binding upon such Party.

**IN WITNESS WHEREOF**, the Parties have executed this LOI as of the date first written above.

**Harken Energy Corporation**

By: _____
Name:  Mikel D. Faulkner
Title:    President and Chief Executive Officer

**International Business**          **International Business**
   **Associates, Ltd.**                       **Associates, Ltd.**

By: _____     By: _____
Name:  John Kean, Jr.                Name:  Stanley J. Brownell
Title:  President and Chief Executive Officer    Title: Chief Operating Officer

4

HEC Comments 8/06/04

Exhibit 1

## **Management Guidelines**

The purpose of this document is to set forth the scope of powers and authority granted to the President and the Chief Operating Officer of International Business Associates (hereinafter "IBA" or the "Company"). This list may be amended from time to time by the affirmative vote of 80% of the outstanding common Stock of the Company. The above referenced officers of the Company are hereby charged and empowered with the responsibility to:

    (a) hire the employees of the Company, establish their salaries, duties and obligations, and generally exercise employer's rights over the employees of the Company subject to Board adopted employment policies;

    (b) carry out the management of the Company's affairs in accordance with applicable laws and generally represent the Company in its ordinary course of business affairs;

    (d) prepare and submit the annual budgets for the Company to the Board of Directors for approval;

    (f) prepare and submit, on a monthly basis, financial reports and any other written reports for review by the Board of Directors in respect of the activities of the Company;

    (g) prepare and maintain the secretarial records and books of account for the Company;

    (h) create a system of financial controls that produces financial statements in accordance with U.S. GAAP and that is auditable under generally accepted auditing standards;

    (i) manage the daily operations of the Company's bank account(s), issuance of letters of credit and interactions with financial institutions;

    (j) determine, the timing and amounts of preferred stock to be redeemed subject to Board approval; and

    (k) any other responsibilities that may be granted from time to time following an affirmative vote of a majority of the Board of Directors and the above referenced approval by shareholders.

In exercising their duties, the President and Chief Operating Officer shall require all formal and binding documents to either contain the signature of both the President and the COO or, in the absence of either the President or COO, either the signature of the President or COO with the written approval of the Board of Directors.

1

The powers of the President and Chief Operating Officer in the day-to-day management and administration of the Company shall be restricted in that they shall not, without the prior approval of a majority of the Board of Directors of the Company:

(a) borrow any money in excess of $500,000 in respect of a single transaction or a series of transactions not necessarily related to each other but in no event shall the collective borrowings exceed $1 million without Board approval, provided, however, that this limitation shall not apply to borrowings approved in the Company's Annual Budget;

(b) incur capital expenditures in any single transaction or related series of transactions in noncompliance with the Company's Annual Capital Budget in excess of $250,000, provided however that the such capital expenditures shall in the aggregate not exceed $500,000 without Board approval;

(c) issue or grant any suretyship, indemnity or guarantee for or on behalf of the Company in excess of $750,000, provided however that the aggregate sureties, indemnities and guarantees granted by the President and COO shall not exceed $1.5 million without Board approval;

(d) enter into any agreement under the terms of which all or a major part of the business of the Company is sold, encumbered or subcontracted to a third party in any manner;

(e) encumber any capital assets of the Company;

(f) acquire or dispose of any immovable property or any intellectual property rights in excess of $250,000;

(g) conclude any joint venture, partnership, or similar arrangement with any third party;

(h) commit the Company to long term (over twelve months) commitments outside of the Company's Approved Annual Budget in excess of $500,000, except transactions concerning gas trade (acquisition, sale, nomination, transfer, storage and distribution of gas).

(i) enter into any agreement or contract, or a series of agreements or contracts not necessarily related to each other, which would result in obligations for the Company exceeding $500,000, except transactions concerning gas trade (acquisition, sale, nomination, transfer, storage and distribution of gas).

(j) with respect to (h) and (i) above, the aggregate obligations of all gas trade obligations shall not exceed a VaR (Value at Risk) of $750,000 and such limit shall be incorporated into the Company's risk management policy.

2

# EXHIBIT B

## REDEMPTION AND RELEASE AGREEMENT

This Redemption and Release Agreement (this "Agreement") is entered into as of January 31, 2006 (the "**Effective Date**"), by and among International Business Associates Holding Co., Ltd., a British Virgin Islands company ("**IBAH**"), International Business Associates (USA), Inc., a Delaware corporation ("**IBA USA**"), International Business Associates, Ltd., an exempt Turks and Caicos company (the "**Company**"), John Kean, Jr., and Stanley J. Brownell (together with Mr. Kean, the "**Stockholders**").

WHEREAS, IBAH owns (i) 12,500 Preferred Shares, (ii) the Warrant, and (iii) 24 shares of IBA USA Common Stock;

WHEREAS, the Stockholders own 26 shares of Common Stock, being all of the issued and outstanding Common Stock and all of the issued and outstanding ownership interests in the Company other than the 12,500 Preferred Shares owned by IBAH;

WHEREAS, IBAH and the Company desire to restructure their relationship on the terms and conditions set forth herein;

WHEREAS, the Company, IBA USA, IBAH, and the Stockholders each desire to effect the Redemption and to settle and compromise fully and finally any and all disputes, controversies, entitlements, and claims that IBAH may have against the Company, IBA USA, or the Stockholders or that the Company, IBA USA, or the Stockholders may have against IBAH, on the terms and conditions set forth herein.

WHEREAS, capitalized terms used in this Agreement are used as defined on ATTACHMENT A to this Agreement, unless the context otherwise requires.

NOW, THEREFORE, in consideration of the promises, covenants, and agreements contained herein, the parties agree as follows:

1. **Redemption.**

1.1    <u>Redemption</u>. Subject to the terms and conditions set forth in this Agreement, IBAH agrees to sell to the Company, and the Company agrees to purchase and redeem from IBAH, 7,500 Preferred Shares and the Warrant, and IBAH agrees to sell to IBA USA, and IBA USA agrees to purchase and redeem from IBAH, 24 shares of IBA USA Common Stock.

1.2    <u>Closing</u>.

(a)    The closing of the Redemption (the "**Closing**") shall be effective as of the Effective Date.

(b)    (IBAH's Deliveries)  At Closing, IBAH shall deliver to the Company and to IBA USA:

(i)    One or more share certificates evidencing 7,500 Preferred Shares, together with a stock power executed in blank;

(ii) One or more share certificates evidencing 24 shares of IBA USA Common Stock held by IBAH accompanied by a stock power executed in blank;

(iii) The Warrant;

(iv) Resignation letters executed by Alan Quasha and Elmer Johnston whereby such persons resign from their positions as directors of the Company and IBA USA; and

(v) Copies of minutes or consents of the Board of Directors of IBAH authorizing IBAH's execution, delivery and performance of this Agreement.

(c) (The Company's Deliveries)  At Closing, the Company and IBA USA shall deliver to IBAH:

(i) US$7,500,000 by wire transfer of immediately available funds to an account or accounts designated by IBAH;

(ii) to the extent that the stock certificates delivered by IBAH evidence ownership of an amount in excess of 7,500 Preferred Shares, a replacement stock certificate issued by the Company in the name of IBAH evidencing such excess number of Preferred Shares;

(iii) Copies of minutes or consents of the Company's Board of Directors authorizing the Company's execution, delivery and performance of this Agreement by the Company; and

(iv) Copies of minutes or consents of IBA USA's Board of Directors authorizing IBA USA's execution, delivery and performance of this Agreement.

(d) (Mutual Deliveries)  IBAH, the Company and IBA USA shall have executed and mutually delivered a Confidentiality Agreement substantially in the form attached to this Agreement as ATTACHMENT B.

1.3    Termination and Modification of Agreements.  From and after the Closing, except as otherwise set forth in this Agreement or any agreement, instrument, or document executed in connection herewith or delivered at Closing, all agreements between IBAH and its affiliates, on the one hand, and the Company, IBA USA, the Stockholders, and their respective affiliates, on the other hand, shall be terminated.  Without limiting the generality of the foregoing, the Warrant and that certain letter agreement dated September 10, 2004, between the Company and Harken shall be terminated and of no further force or effect from and after the Closing.

2. **Releases**.

    2.1    <u>IBAH Release</u>.

        (a)    IBAH and Harken hereby acknowledge that, in consideration for the Redemption and the releases contained herein made by the Company, IBA USA, and the Stockholders, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, from and after the Closing, IBAH and Harken hereby fully, finally, and completely releases each of the Company, IBA USA, the Stockholders, and their respective predecessors, successors, subsidiaries, affiliates, owners, partners (both general and limited), stockholders, officers, directors, employees, agents, attorneys, representatives and representatives of each of them (the "**Company Released Parties**"), of and from any and all claims, actions, demands, and/or causes of action, of whatever kind or character, whether now known or unknown, arising from, relating to, or in any way connected with, facts or events occurring on or before the Closing, including as a stockholder of the Company; provided, however, that neither IBAH nor Harken is not releasing any claims for breach of any representation, warranty, covenant or agreement of this Agreement or any agreement, instrument, or document executed or delivered in connection with the Closing by any Company Released Parties. IBAH and Harken agree that this Agreement includes a release of any negligence claims, contractual claims for breach or default, and any claims for any alleged breach of fiduciary duties owed by the Company, IBA USA, the Stockholders, or any of the other Company Released Parties in any capacity, and any related attorneys' fees and costs, if any, that IBAH or Harken may have against the Company, IBA USA, the Stockholders, or any other Company Released Parties. IBAH and Harken waive and release the Company Released Parties from each and every claim that this Agreement was procured by fraud or signed under duress or coercion so as to make this release not binding. IBAH and Harken understand and agree that by signing this Agreement they are giving up the right to pursue legal claims that it may have against any of the Company Released Parties.

        (b)    The release set forth in this Section 2.1 is intended as a release of all claims against the Company Released Parties, whether now known or unknown. In furtherance thereof, IBAH and Harken expressly waive any right or claim of right to assert hereafter that any claim, demand, obligation and/or cause of action has, through ignorance, oversight, error or otherwise, been omitted from the terms of this Agreement. IBAH and Harken make this waiver with full knowledge of their rights, after consulting with legal counsel, and with specific intent to release both their known and unknown claims.

        (c)    IBAH and Harken hereby represent and warrant that neither IBAH nor Harken has assigned or otherwise transferred to any other person or entity any interest in any claim, action, demand and/or cause of action it has, or may have, or may claim to have in connection with the matters released hereby and/or the persons and entities released herein, and hereby agrees to indemnify and hold harmless all persons or entities hereby released from any and all injuries, harm, damages, penalties, costs, losses, expenses and/or liability or other detriment including all reasonable attorneys' fees incurred as a result of any and all claims, actions, demands, and/or causes of

3

action of whatever nature or character that may hereafter be asserted against any of the Company Released Parties by any person or entity claiming by, through or under IBAH or Harken by virtue of such an assignment or other transfer.

2.2    <u>Company Release</u>.

(a)    The Company, IBA USA, and the Stockholders (collectively, the "**Releasing Parties**") hereby acknowledges that in consideration for the releases contained herein made by IBAH and Harken, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, from and after the Closing, the Releasing Parties hereby fully, finally, and completely release IBAH, Harken, and their respective predecessors, successors, subsidiaries, affiliates, owners, partners (both general and limited), stockholders, officers, directors, employees, agents, attorneys, representatives and representatives of each of them (the "**IBAH Released Parties**"), of and from any and all claims, actions, demands, and/or causes of action, of whatever kind or character, whether now known or unknown, arising from, relating to, or in any way connected with, facts or events occurring on or before the Closing, including as an employee, director or stockholder of the Company or IBA USA; provided, <u>however</u>, that the Releasing Parties are not releasing hereby any claim for breach of any representation, warranty, covenant or agreement of this Agreement or any agreement, instrument, or document executed or delivered in connection with the Closing by any IBAH Released Parties.  The Releasing Parties agree that this Agreement includes a release of any negligence claims, contractual claims for breach or default, and any claims for any alleged breach of fiduciary duties owed by IBAH, Harken or any of the other IBAH Released Parties in any capacity, and any related attorneys' fees and costs, if any, that the Releasing Parties may have against IBAH, Harken or any other IBAH Released Parties. The Releasing Parties waive and release the IBAH Released Parties from any claim that this Agreement was procured by fraud or signed under duress or coercion so as to make this release not binding.  The Releasing Parties understand and agree that by signing this Agreement they are jointly and severally giving up the right to pursue any legal claim that they may have against any of the IBAH Released Parties.

(b)    The release set forth in this Section 2.2 is intended as a release of all claims against the IBAH Released Parties, whether now known or unknown.  In furtherance thereof, the Releasing Parties expressly waive any right or claim of right to assert hereafter that any claim, demand, obligation and/or cause of action has, through ignorance, oversight, error or otherwise, been omitted from the terms of this Agreement.  The Releasing Parties make this waiver with full knowledge of their respective rights, after consulting with legal counsel, and with specific intent to release all of their respective known and unknown claims.

(c)    The Releasing Parties hereby represent and warrant that they have not assigned or otherwise transferred to any other person or entity any interest in any claim, action, demand and/or cause of action they have, or may have, or may claim to have in connection with the matters released hereby and/or the persons and entities released herein, and hereby agree, jointly and severally, to indemnify and hold harmless all persons or entities hereby released from any and all injuries, harm,

damages, penalties, costs, losses, expenses and/or liability or other detriment including all reasonable attorneys' fees incurred as a result of any and all claims, actions, demands, and/or causes of action of whatever nature or character that may hereafter be asserted against any of the IBAH Released Parties by any person or entity claiming by, through or under the Releasing Parties by virtue of such an assignment or other transfer.

3. **Certain Covenants and Agreements.** IBAH, IBA USA, the Company and the Stockholders hereby covenant and agree with each other as follows:

    3.1    <u>Financial Statements</u>.

        (a)    The Company and IBA USA shall reasonably cooperate with IBAH, its parent company, and their auditors in IBAH's 2005 fiscal year end audit and the preparation of IBAH's 2005 fiscal year end audited financial statements.

        (b)    If and so long as IBAH holds of record any of the capital stock of the Company, the Company shall provide to IBAH on or before the 20th day of April, July, October, and January, in respect of the immediately preceding calendar quarter, quarterly and year-to-date consolidated income statements and balance sheets through December 31, 2006, and, in January, the year end financial statements for the preceding year.

    3.2    <u>Management</u>.    If and so long as IBAH holds of record any of the capital stock of the Company, the Company and IBA USA shall continue to operate their respective businesses through the earlier to occur of December 31, 2006, or a Conversion Event (defined below), consistent in all respects with the management guidelines set forth in "Exhibit A" to the Stockholders Agreement.

    3.3    <u>Certain Liabilities</u>.    IBAH shall indemnify the Company, IBA USA, and the Stockholders from and against any obligation that may arise or may have arisen under that certain Fee Agreement between Emerging Markets Group and the Company dated September 8, 2004, to pay fees to Emerging Markets Group.

    3.4    <u>Cooperation</u>.  IBAH, at its own expense, shall reasonably cooperate in good faith with the Company in its efforts to find new sources of capital funding.

    3.5    <u>Additional Redemption</u>.

        (a)    At any time from and after the Closing until December 31, 2006, subject to the terms and conditions of this Agreement, the Company shall have the right, at its sole option, to redeem all, but not less than all, of the Preferred Shares held by IBAH for cash consideration equal to US $5,000,000.  The Company shall give IBAH written notice (the "**Redemption Notice**") of its intention to redeem the Preferred Shares, which notice shall state the date for such redemption.  Such date shall be not more than sixty (60) and not less than twenty (20) days from the date the Redemption Notice is received by IBAH.

DALLAS1 1067053v6 68889-00001

(b)    At the closing for any such redemption of such Preferred Shares, IBAH shall surrender to the Company the certificates evidencing such Preferred Shares, duly endorsed in blank or accompanied by an appropriate stock power executed in blank, in exchange for US $5,000,000 paid by wire transfer of immediately available funds to an account or accounts designated by IBAH.

3.6    Conversion.  At any time that IBAH holds of record any Preferred Shares, if the Company shall have received cash proceeds of not less than US $2,000,000 through, or as a result of, any investment in the Company or any financing, recapitalization, reorganization, or sale of capital stock of the Company (or any rights thereto) (a "**Conversion Event**"), the Company shall immediately convert IBAH's Preferred Shares into a number of shares of Common Stock equal to nineteen (19%) percent (on a fully diluted basis after issuance of such Common Stock to IBAH) of the Company's total outstanding and issued Common Stock.  Upon any such conversion, IBAH shall surrender one or more share certificates evidencing IBAH's ownership of its Preferred Shares, and the Company shall deliver to IBAH share certificates evidencing the shares of Common Stock issued to IBAH.  For as long as the Preferred Shares are outstanding, the foregoing conversion obligation shall be in addition to the mandatory redemption obligations set forth in Section 3 of the Terms of Issuance of the Preferred Shares.

4. **Representations and Warranties of IBAH.**    IBAH represents and warrants to the Company, IBA USA and the Stockholders as follows:

4.1    Ownership.  IBAH owns the Redeemed Securities beneficially and of record free and clear of all liens, claims, encumbrances, proxies and restrictions of any kind or nature whatsoever, except restrictions on transfer imposed by applicable securities laws and the Stockholders Agreement.  Except for the Stockholders Agreement, there are no outstanding options, warrants, subscriptions or other rights or obligations to purchase or acquire any of the Redeemed Securities, nor any outstanding securities convertible into or exchangeable for any of the Redeemed Securities.

4.2    Authority.  Upon the execution and delivery by IBAH of this Agreement and the other agreements contemplated hereby, this Agreement and the other agreements contemplated hereby will constitute the legal, valid, and binding obligations of IBAH.  IBAH has the right, power, and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.  IBAH is not, nor will be, required to obtain any consent from any person in connection with the execution and delivery of this Agreement and the other agreements contemplated hereby, the consummation or performance of any of the transactions contemplated hereby or thereby, or the sale and delivery of the Redeemed Securities or termination of the Warrant.

5. **Representations and Warranties of the Company.**  The Company and IBA USA represent and warrant to IBAH as follows:

5.1    Capital Structure.  The Company's authorized capital stock (immediately prior to Closing) is US$5,000 divided in 4,000 shares of Common Stock, of which 26 shares are currently issued and outstanding, and 100,000 shares of par value US$0.01 each, of which 12,500 shares have been designated as the Preferred Shares and are outstanding.  The 26 outstanding shares of Common Stock and the 12,500 Preferred Shares represent all of the

6

outstanding equity interests in the Company. There are no outstanding or authorized options, warrants (other than the Warrant), purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that require the Company to issue, sell or otherwise cause to become outstanding any of its capital stock. There are no outstanding stock appreciation, phantom stock or similar rights with respect to the Company. The Company has no obligation of any kind to issue any additional equity interests in the Company to any person.

    5.2    <u>Authority</u>. Upon the execution and delivery by the Company of this Agreement and the other agreements contemplated hereby, this Agreement and the other agreements contemplated hereby will constitute the legal, valid, and binding obligations of the Company. The Company has the right, power, and authority to execute and deliver this Agreement and to perform its obligations under this Agreement. The Company is not, nor will be, required to obtain any consent from any person in connection with the execution and delivery of this Agreement and the other agreements contemplated hereby, the consummation or performance of any of the transactions contemplated hereby or thereby, or the redemption of the Redeemed Securities.

6.   **Representations and Warranties of the Stockholders.** Each Stockholder, severally for himself only, represents and warrants to IBAH as follows:

    6.1    <u>Ownership</u>. Such Stockholder owns 13 shares of Common Stock free and clear of all liens, claims, encumbrances, proxies and restrictions of any kind or nature whatsoever, except those imposed by applicable securities laws and the Stockholders Agreement. Except for the Stockholders Agreement, there are no outstanding options, warrants, subscriptions or other rights or obligations to purchase or acquire any of such Stockholder's Common Stock, nor any outstanding securities convertible into or exchangeable for any of such Stockholder's Common Stock.

    6.2    <u>Authority</u>. Upon the execution and delivery by such Stockholder of this Agreement and the other agreements contemplated hereby, this Agreement and the other agreements contemplated hereby will constitute the legal, valid, and binding obligations of such Stockholder. Such Stockholder has the right, power, and authority to execute and deliver this Agreement and to perform his obligations under this Agreement. Such Stockholder is not, nor will be, required to obtain any consent from any person in connection with the execution and delivery of this Agreement and the other agreements contemplated hereby, the consummation or performance of any of the transactions contemplated hereby or thereby.

7.   **Amendments to Stockholders Agreement.** The Stockholders Agreement shall remain in full force and effect, as hereby amended effective as of the Effective Date. The Stockholders Agreement is hereby amended as follows:

    7.1    <u>Ownership</u>. Section 1.1 of the Stockholders Agreement is hereby amended to read in its entirety as follows:

        (a)    <u>Ownership</u>. Without the consent of the Purchaser, at any time that any shares of the Company's Series A Preferred shall remain outstanding, the Founders shall not acquire, by purchase or otherwise, ownership of capital stock representing more than eighty-one percent (81%) of the outstanding

7

shares of capital stock of the Company, on a Fully Diluted Basis, except in accordance with this Agreement. Without the consent of the Founders and subject to the terms and conditions of that certain Redemption and Release Agreement dated January 31, 2006, at any time that any shares of the Company's Series A Preferred shall remain outstanding, the Purchaser shall not acquire, by purchase or otherwise, ownership of capital stock representing more than nineteen (19%) of the outstanding shares of capital stock of the Company, on a Fully Diluted Basis, except in accordance with this Agreement. As used in this Agreement, "Fully Diluted Basis" means, as the context requires, either (a) the aggregate number of Common Stock issued and outstanding at the relevant time, after giving effect to all then outstanding options, warrants, convertible securities or other rights to acquire Common Stock (whether or not then exercisable or exercisable at a price below the then market value of the Common Stock) of all shareowners, and/or (b) the number of Common Stock owned by a particular shareholder at the relevant time, after giving effect to all then outstanding options, warrants, convertible securities or other rights to acquire Common Stock (whether or not then exercisable or exercisable at a price below the then market value of the Common Stock) held by such shareholder.

7.2    Board of Directors.

(a)    Section 1.2 of the Stockholders Agreement is hereby amended to read in its entirety as follows:

The management of the Company and the preparation and adoption of the Company's business plan will be vested in the Board of Directors and such officers as the Board may designate from time to time. Subject to the management guidelines attached hereto as Exhibit A (prior to the earlier to occur of December 31, 2006, or an Investment Event (defined below)) and the other terms of this Agreement, the day-to-day management of the Company will be at the direction of the Board of Directors. The Board and the members appointed thereto (each a "Director") shall be proposed by and shall serve at the direction of the Stockholders as provided for herein and in the Memorandum of Association and Articles of Association. An "Investment Event" shall mean Company's receipt of cash proceeds of not less than US $2,000,000 through, or as a result of, any investment in the Company or any financing, recapitalization, reorganization, or sale of capital stock of the Company (or any rights thereto).

(b)    Section 1.2(a) of the Stockholders Agreement is hereby amended to read in its entirety as follows:

The Board of Directors shall be comprised of five (5) Directors or such other number of directors as may be established in accordance with the Company's organizational documents from time to time. So long as the Purchaser holds of record any shares of the Series A Preferred or

ordinary shares of the Company that entitle the Purchaser to vote at least fifteen percent (15%) of all the votes that may be cast in an election of directors of the Company, the Purchaser shall be entitled to nominate one (1) director for membership on the Board of Directors of the Company, and the Founders shall be entitled to nominate four (4) directors for membership on the Board of Directors of the Company. The Purchaser and the Founders agree to vote for the nominees of each of them. If a Founder is unable to serve or has transferred his shares of Common Stock in the manner permitted by Section 3.3(a), then the Founder's successor in interest as holder of his Shares or his legal representative shall be entitled to nominate directors in the same manner and to the same extent as if the Founder were himself acting.

(c)     Section 1.2(b) of the Stockholders Agreement is hereby amended to read in its entirety as follows:

Subject to the Company's Memorandum of Association and Articles of Association (as in effect on the date hereof and from time to time thereafter) and the terms and conditions of this Agreement, the Board will have the authority on behalf and in the name of the Company to perform all acts necessary and desirable to the objects and purposes of the Company and to comply, as deemed necessary in the Board's sole discretion, with any and all applicable laws, regulations, orders or decrees without a vote of the Stockholders (including but not limited to opening bank or other accounts and negotiating, effecting and authorizing the purchase and sale of Shares); provided (prior to the earlier of December 31, 2006, or an Investment Event) that those matters which, under the terms of Exhibit A, are within the scope of powers and authority of the Company's management shall remain with Company's management unless otherwise modified by the Board as deemed necessary in its sole discretion to comply with any laws, regulations, orders or decrees as set forth in this Subsection (b). In addition, the Board is hereby authorized to amend the terms of Exhibit A at any time after of earlier of December 31, 2006, or an Investment Event. The Purchaser and the Founders agree to instruct their Board of Directors nominees to elect John Kean Jr. as the Chairperson of the Board, so long as he is able to serve and remains a Stockholder. He shall preside over all Board meetings. As used in this Agreement, "Shares" means and includes any and all shares of Common Stock and/or shares of capital stock of the Company, by whatever name called, which carry voting rights and shall include any such shares now owned or subsequently acquired by a Stockholder, however acquired, including without limitation stock splits and stock dividends.

7.3     <u>Certain Actions Requiring Special Unanimous Approval</u>. The clause "(so long as any shares of the Series A Preferred remain outstanding)" in Section 2.1 of the Stockholders Agreement is hereby amended to read as "(except in connection with an Investment Event or

9

after the conversion of the Series A Preferred to Common Stock as a result of such Investment Event)".

7.4    Rights of First Refusal and Purchase Options. From and after an Investment Event, the term "Purchaser" as used in Sections 3.4 through 3.7, inclusive, of the Stockholders Agreement shall be deemed to refer to all shareholders of the Company other than the Founders. In addition, for purposes of Sections 3.4 through 3.7, inclusive, of the Stockholders Agreement, the purchase rights of all shareholders of the Company other than the Founders shall be pro rata in accordance with such shareholders' respective ownership interests in the Company (or such other allocation as may be agreeable among such shareholders if any shareholder desires to purchase less than its pro rata share).

7.5    Pre-Emptive Rights. A new Section 3.9 shall be added to the Stockholders Agreement, which shall read in its entirety as follows:

    3.9    Preemptive Rights. The Company hereby grants to Purchaser a right of first refusal to purchase its Pro Rata Share (as defined herein) of New Securities (as defined herein) that the Company may, from time to time, propose to issue and sell at any time that the Purchaser holds of record any shares of the Series A Preferred or ordinary shares of the Company that entitle the Purchaser to vote at least fifteen percent (15%) of all the votes that may be cast in an election of directors of the Company.

    (a)    Notice. If the Company proposes to undertake an issuance or sale of New Securities the Company shall give the Purchaser written notice of its intention, describing the amount and type of New Securities and the price and terms upon which the Company proposes to issue the same. The Purchaser shall have thirty (30) days from the date of receipt of any such notice to agree to purchase up to its respective Pro Rata Share of such New Securities for the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased. The closing of the purchase of the New Securities to be issued and sold to the Purchaser shall occur at the same time as the closing of the sale of New Securities not elected or eligible to be purchased by Purchaser shall occur.

    (b)    Eligible Sales to Third Parties. After giving the notice and opportunity for Purchaser to participate as required under Section 3.9(a) above, the Company shall have ninety (90) days thereafter to issue and sell the New Securities not elected nor eligible to be purchased by the Purchaser at the price and upon the terms no more favorable to the purchasers of such securities than specified in the Company's notice under Section 3.9(a). In the event the Company has not sold such New Securities within said ninety (90) day period, the Company shall not thereafter issue or sell any New Securities without first offering such securities to the Purchaser in the manner provided above.

    (c)    Definitions. For purposes of this Agreement, the following terms have the following definitions:

10

(i) "New Securities" means any shares of capital stock of the Company, including Common Stock and any series of preferred stock, whether now authorized or not, of any type whatsoever that are, or may become, convertible into or exchangable for said shares of Common Stock and rights, options or warrants to purchase said shares of Common Stock or preferred stock, and securities of any type whatsoever that are, or may become, convertible into or exchangeable for said shares of Common Stock or such preferred stock; provided, however, that for purposes hereunder, "New Securities" does not include (A) Common Stock offered to the public generally pursuant to a registration statement under the Securities Act of 1933, as amended; or (B) securities issued in connection with any stock split or stock dividend by the Company.

(ii) "Pro Rata Share" means the ratio that (A) the sum of the total number of shares of Common Stock that are then held by the Purchaser, on a Fully Diluted Basis, bears to (B) the sum of the total number of shares of Common Stock then outstanding, on a Fully Diluted Basis.

7.6    Balance of Agreement.  Except as modified by this Agreement, the Stockholders Agreement shall continue in full force and effect after Closing.

8.  **Choice of Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to the conflicts of law provisions thereof).  To the extent that any conflict may arise between the terms and conditions of this Agreement and the terms and conditions of the Company's Memorandum of Association or Articles of Association or any other organizational document, the terms and conditions of this Agreement shall prevail.

9.  **Terms Confidential.** The parties shall use reasonable commercial efforts to keep the terms, amounts and facts of this Agreement completely confidential to avoid disclosure hereafter of any information concerning this Agreement to anyone except their respective attorneys, accountants, or other professional advisors.  Notwithstanding the foregoing prohibition, (a) the parties shall not be prohibited from disclosing the terms, amounts and facts of this Agreement or this Agreement itself as may be requested by governmental entities or as may be required by law, including any Federal or state securities laws or regulations, and (b) the Company shall not be prohibited from disclosing the terms, amounts and facts of this Agreement or this Agreement itself as may be requested by any person or entity with whom the Company is engaged in discussions with concerning any investment in the Company or any financing, recapitalization, reorganization, or sale of the capital stock of Company (or any rights thereto) or all or substantially all of the assets of the Company.  The Company may inform its employees the transactions contemplated by this Agreement.

10. **Entire Agreement.** In addition to the Stockholders Agreement, the Executive Employment Agreements dated September 10, 2004, between the Company and each of the Stockholders shall remain in full force and effect.   Otherwise, this Agreement, and the other agreements,

instruments, or documents executed in connection herewith or delivered at Closing, constitute the entire agreement among the parties with respect to the subject matter hereof and thereof, and supersede any other agreement with respect hereto and thereto, and there are no other or continuing agreements or understandings between IBAH, on one hand, and the Company, IBA USA, or the Stockholders, on the other hand, except as expressly recited herein or therein; provided, that, the foregoing shall not affect any agreements solely between the Company, IBA USA, and the Stockholders to the extent that the IBAH Released Parties are not affected thereby.

11. **Execution in Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall constitute an original, but such counterparts together shall constitute but one and the same Agreement.  The exchange of copies of this Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

12. **Legal Advice.**  Each party hereto acknowledges that such party has had the advice of independent counsel selected by such party in connection with the terms of this Agreement and the other agreements executed in connection herewith, and that no offer, promise, inducement or consideration of any kind or degree, except as expressly stated in this Agreement, has been provided or promised to such party by any other party or person in connection with such party's entry into this Agreement and the other agreements executed in connection herewith.

13. **Severability.**  Should any provision of this Agreement be declared and/or be determined by any court to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby.

14. **Expenses.**  Except as otherwise provided in this Agreement, each party to this Agreement will bear its respective fees and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement and the transactions contemplated by this Agreement, including all fees and expenses of its agents and representatives.  If any party hereto is institutes a Proceeding to enforce such party's rights in accordance with the provisions of this Agreement, the prevailing party shall be entitled to recover its reasonable expenses, including attorneys' fees, in connection with any such action.

15. **Further Assurances.**  At any time and from time to time, upon the reasonable of a party hereto, each other party hereto shall promptly execute and deliver all such further agreements, documents, and instruments and take such further action as may be necessary or appropriate to carry out the provisions and purposes of this Agreement or any other agreement executed in connection herewith.

16. **Miscellaneous.**  This Agreement shall be binding upon, and inure to the benefit of the parties hereto and their respective heirs, successors and assigns. A modification or waiver of any of the provisions of this Agreement shall be effective only if made in writing and signed by each of the parties hereto.  The failure of any party to insist upon the strict performance of any of the provisions of this Agreement shall not be construed as a waiver of any subsequent default of the same or any other provision.

DALLAS1 1067053v6 68889-00001

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Filed SDNY April 11, 2007

-------------------------------------------------X

THOMAS M. FLOHR d/b/a EMERGING      :
MARKETS GROUP
          Plaintiffs,                                    :

                                      :

   -against-                                            :

                                        :

INTERNATIONAL BUSINESS                     :
ASSOCIATES, LTD
          First Defendant                            :

                                        :

INTERNATIONAL BUSINESS ASSOCI-      :
ATES HOLDINGS CO., LTD, INTER-         :
NATIONAL BUSINESS ASSOCIATES         :
(USA), INC, JOHN KEAN, JR, and          :
STANLEY J. BROWNELL                        :
          Second Defendants                          :

                                        :

HARKEN ENERGY CORPORATION           :
          Third Defendant                            :

                                        :

-------------------------------------------------X

**COMPLAINT**

**JURY TRIAL DEMANDED**

FILE No: **07 CV 2920**   **(RWS)**

**ECF CASE**

      Plaintiff, THOMAS M. FLOHR, d/b/a EMERGING MARKETS GROUP

("Plaintiff" or "EMG"), by their attorneys Law Offices Joel Z. Robinson & Co, avers as follows

as its Complaint ("Complaint") against INTERNATIONAL BUSINESS ASSOCIATES, LTD

First Defendant , ("Company")  and INTERNATIONAL BUSINESS ASSOCIATES HOLD-

INGS CO., LTD,("IBAH")  INTERNATIONAL BUSINESS ASSOCIATES (USA), INC, ("IBA

USA")  JOHN KEAN, JR., ("Mr. Kean, Jr.") and STANLEY J. BROWNELL ("Mr. Brownell")

("Second Defendants"), and HARKEN ENERGY CORPORATION ("Harken") , the Third

Defendant, ("Third Defendant" and together with Second Defendants  "Indemnitors ") either

jointly or severally, alleges upon personal knowledge for its own acts and upon information and